UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RYAN JUDSON MOORE,

        Petitioner,

    v.

SCOTT FRAUENHEIM,

        Respondent.

No.  2:19-cv-155-WBS-EFB P

FINDINGS AND RECOMMENDATIONS

Petitioner is a California state prisoner who, proceeding with counsel, brings an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He was convicted in the Solano County Superior Court of second degree murder (Pen. Code § 187, subd. (a)) and firearm enhancements (§§ 12022.53 (b)-(d)).  The instant habeas petition raises three claims.  First, petitioner argues that the state court erred when it concluded that his constitutional rights were not violated in light of a juror's prejudicial statements during deliberations.  Second, he argues that the state court of appeal unreasonably concluded that the jury's discussions regarding his failure to testify did not amount to federal constitutional error.  Third, petitioner argues that the state court of appeal unreasonably concluded that the instructions on involuntary manslaughter did not relieve the prosecution of its burden of proof on the issue of malice.

For the reasons stated below, it is recommended that the petition be denied.

/////

## FACTUAL BACKGROUND

Both petitioner and the respondent accept[1] (and reproduce in their briefs) the state court of appeal's summation of the facts. ECF No. 1 at 16; ECF No. 19-1 at 9. The court has reviewed the record and, having done so, finds nothing therein that clearly and convincingly rebuts the summation. *See Moses v. Payne*, 555 F.3d 742, 746 n. 1 (9th Cir. 2009) ("Because this initial statement of facts is drawn from the state appellate court's decision, it is afforded a presumption of correctness that may be rebutted only by clear and convincing evidence."). Thus, the summation is reproduced here:

*Prosecution Case*

On October 23, 2012, at around 7:00 or 8:00 p.m., Moore invited his friend, Timothy W., over to play a video game. Timothy walked to Moore's house in Suisun City. When Timothy arrived at Moore's house, he walked in through the open front door, used the restroom, then returned to the living room and sat down in a tan recliner. Moore was standing by a blue recliner. Brown, who was a friend of Moore's and the girlfriend of Timothy's uncle, was sitting on the couch.[2] Brown and Moore were acting friendly.

Moore asked Brown to make him a burrito. She agreed and went to the kitchen. Meanwhile, Moore received a text message from his ex-girlfriend, which he showed to Timothy. Immediately thereafter, Moore looked "sad" and "down." Timothy asked, "can we play the game now[?]" Brown returned from the kitchen, handed Moore a plate with the burrito, and sat down again on the couch. Moore put the plate down and picked up a bottle of tequila, which he guzzled "like it was water." Moore's sister called and asked to borrow a tool. After Moore refused, his sister hung up. Moore said, "my family hates me" and guzzled more tequila, still appearing sad.

---

[1] Petitioner offers the qualification that he "accepts the Court of Appeal's summary of procedural and general evidentiary facts except to the extent it is inconsistent with the express or implied factual averments and/or legal arguments set forth below." ECF No. 1 at 16. Having reviewed the petition, the court concludes that nothing therein contradicts the summation. Petitioner does offer additional background discussing why the state's own evidence militated in favor of an involuntary manslaughter verdict (*id.* at 20-22), but this additional context/argument does not contradict or otherwise invalidate the state court's summation.

[2] [footnote in original text] Moore was letting Brown stay at the house for a few days because Timothy's uncle had obtained a restraining order against her.

While remaining seated in the recliner, Moore began playing with a butterfly knife. Timothy told Moore, who was two or three feet from him, not to play with the knife because it could "fly out of his hand and cut one of us." Brown said, "'he's not going to cut me.'" The knife fell out of Moore's hand and dropped to the floor. Moore stood up and went to a corner of the room, where he picked up a rifle without saying anything.[3] Moore held the rifle with two hands and banged the barrel of the rifle against his head twice.

Timothy, who was still seated in the tan recliner, told Moore, "put the gun down." Moore did not and, while standing about one foot away from Brown, aimed it at Brown's front left side. Moore was still using both hands to hold the rifle—one hand was on the front of the gun and the other was on the trigger. Timothy told Moore to take his finger off the trigger. Brown said, "'he's not going to shoot me.'" Moore "fired the gun."[4]

Timothy asked Moore: "Did you shoot her? Did you shoot her? Like are you playing? Are you playing?" After being shot, Brown stood up and said, "'this mother fucker shot me.'" She slumped and held her side. Moore dropped the rifle, went to Brown, and attempted to stop the bleeding and give her cardiopulmonary resuscitation. Fearing for his own life, Timothy ran to his uncle's house a few blocks away. Because Timothy did not have a cell phone, he called 911 from his uncle's home, telling the dispatcher he witnessed "a white guy" shoot "a black female." After calling 911, Timothy called his mother and asked her to drive him back to Moore's house. There, Timothy told police he witnessed the shooting.[5]

/////

/////

/////

---

[3] [footnote in original text] Moore's brother-in-law lived with Moore and was not at home on the evening of the shooting. He testified that the rifle belonged to Moore; Moore initially kept the rifle in his bedroom; and, more recently, had kept the rifle in the living room.

[4] [footnote in original text] The prosecutor asked Timothy if Moore said anything before firing the gun. Timothy answered, "No." Timothy was then asked if he remembered testifying at the preliminary hearing that, before firing the gun, Moore said, "I'm going to shoot her." After reviewing the preliminary hearing transcript and a statement he gave to a police officer on the night of the shooting, Timothy still could not recall stating as much. Timothy was asked, "Do you remember [Moore] saying 'I'm going to shoot her then' that evening before he fired the gun?" Timothy answered: "I don't recall. I think so." Finally, when asked if on the night of the incident he related to police the statement, "I'm going to shoot her then," Timothy recalled having done so. On redirect examination, Timothy again stated he could not currently remember what Moore said on the night of the shooting.

[5] [footnote in original text] On cross-examination, Timothy denied ever touching the gun.

3

*Police Investigation*

At 8:19 p.m., Moore called 911, telling the operator he killed someone by "accident" and had tried to give her cardiopulmonary resuscitation, but she was going to die. The dispatcher could not understand Moore and hung up after 30 seconds. Moore called back a minute later.

When Suisun City Police Department Officers James Sousa and David O'Brien arrived at the scene, Moore was standing in the doorway, smoking a cigarette, and talking on a phone. Moore was "frantic, confused, crying," and had blood on his hands. On the living room floor, Sousa and O'Brien found Brown's unresponsive body. Brown had been shot in the chest above her left breast. A video game controller was found on the tan recliner and a bottle of tequila was found nearby.

The police officers searched "[e]verywhere" for a firearm—inside the house, inside the garage, and outside. It was dark, but Sousa used a flashlight to search the front yard, the backyard, as well as the side yard between Moore's house and a neighbor's house to the east. O'Brien searched the side yard on the west side of the house. No weapon was located.

Later that night, while in a holding cell at the police station, Moore banged on his cell door and spontaneously told a police officer, "I killed her. I did it. He ain't got nothing to do with it." Moore repeatedly said it was an accident and he did not mean for it to happen. Later, when the same officer transported Moore to county jail, Moore again said the shooting was an accident. Moore, who appeared to be under the influence of alcohol, also said he was going to jail for a long time "because that's what happens when you kill someone."

Forensic pathologist, Susan Hogan, M.D., determined Brown died from a gunshot wound to the chest. Hogan did not observe any soot or stippling on Brown's clothing or body, which she would expect to see if the gun was fired within three feet of the victim.

*Defense Case*

Moore's next door neighbor came home from his night shift early in the morning on October 24, 2012. Using a flashlight, he looked over Moore's front yard for five minutes but did not see a gun. Around noon, the neighbor went back outside and saw a rifle in Moore's front yard. Police collected the weapon. No latent fingerprints were found on the weapon, a .22-caliber rifle. The rifle had water spots on it that could have been produced by someone cleaning it. Low level DNA mixtures were found on the rifle, but the samples were insufficient for interpretation.

/////

/////

4

On the night of the shooting, both Moore and Timothy were tested for the presence of gunshot residue.[6]  The results were positive for each.  As gunshot residue can be found on a person's hands after firing a weapon or being in the vicinity of a fired weapon, the shooter's identity could not be determined.  A blood sample was also taken from Moore at around 10:50 p.m. on October 23. The sample showed Moore had a 0.33 percent blood alcohol concentration (BAC).

The defense firearms expert, criminalist Peter Barnett, examined the rifle and observed it had an intermittent problem where the trigger could be cocked simply by rotating the bolt, rather than pulling it back.[7]  Barnett's test of the rifle's trigger pull showed it requires three pounds of pressure to pull the trigger, which is somewhat lighter than in similar weapons.  Barnett opined that if a person were to hold the rifle in the standard way with his finger on the trigger, and another person yanked it out of his hands with a sudden motion, that action could cause sufficient force for the gun to discharge.

Psychiatrist Randall Solomon, M.D., testified as an expert regarding the effects of alcohol on the brain and memory. Solomon testified alcohol can impact memory after as little as two drinks, but the more a person drinks, the more likely it will cause memory problems, such as a "blackout"—a type of amnesia that happens when short-term memories do not get encoded as long-term memories. Short-term memory is not affected by alcohol.  A person can still function during a blackout and observers might not know it is happening. Fragmentary blackout is the most common type.  It creates holes in memory that a person might not be aware of until asked about something he cannot remember.  A complete blackout is a period of no memory at all.

At 0.3 percent BAC, Solomon opined there would be a greater than 50 percent chance of a blackout. Not everyone would experience blackout at that BAC, but drinking very rapidly would also increase the probability.  If BAC was at that level three hours after a person stopped drinking, his or her BAC necessarily would have declined to that level from an earlier, higher BAC. If someone was able to remember details an hour or three hours later then he would not have been in a complete blackout, unless he had been rehearsing these details in his short term memory the entire time.

---

[6] [footnote in original text] Timothy, who had been arrested before, later hired an attorney because he felt the police were pressuring him to "say something [he] had nothing to do with."

[7] [footnote in original text] On cross-examination Barnett acknowledged that even though the rifle had an intermittent issue, the rifle would not be capable of firing unless the cartridge was inserted into the chamber.  He also acknowledged that, in order to chamber a round, the bolt must be pulled up into the open position and pulled down all the way back, then pushed forward.  The rifle is a single-action weapon, meaning the hammer has to be cocked and ready to fire before you press the trigger.  in addition, before it can be fired, the safety has to be off.

Moore's friend, Rashaun M.,[8] testified that on the night of the shooting he was at a hospital in San Francisco with his daughter. Rashaun received a phone call from his family that night, during which he spoke to Timothy about what happened. Timothy did not mention a gun. After learning Brown had been shot, Rashaun told Timothy to go back to Moore's house and call the police. Sometime later, Rashaun saw Timothy in person. Timothy then told Rashaun that, when Moore dropped the gun, Timothy picked it up, hopped over the couch, and ran with it to his uncle's home.

Six character witnesses testified they knew Moore to be peaceful, reliable, generous, trustworthy, protective, and honest.

*People's Rebuttal Case*

Angela M., Rashaun's aunt and Timothy's mother, testified she had been sitting outside the courtroom with Timothy during Moore's trial. Rashaun approached her and said he was going into the courtroom. When Angela asked him not to, Rashaun said, "Auntie, I don't give an 'F' about [Brown]." He added, "If I get called as a witness, I'm going to lie for my partner, to get my partner off."

*Instructions and Closing Argument*

The trial court repeatedly informed the jury of Moore's constitutional right not to testify and that no negative inference could be drawn from Moore's exercise of the right.[9] The jury also received instructions, among others, on premeditated first degree murder, express and implied malice second degree murder, accidental homicide, and involuntary manslaughter. Moore also requested, and received, an instruction that if, while unconscious as the result of voluntary intoxication, he killed without malice or intent to kill, the crime was not murder, but involuntary manslaughter. The jury was also instructed, as to crimes requiring specific intent, that it could consider the effect of Moore's voluntary intoxication, if any, when determining whether he formed such intent.

During closing argument, the prosecutor maintained Moore was guilty of either first or second degree murder. The People relied on both express and implied malice theories, arguing that Moore's words and actions—aiming the rifle at Brown's chest and pulling the trigger after being warned to put the gun down and take his finger off the trigger—showed either intent to kill or conscious disregard for human life.

---

[8] [footnote in original text] Rashaun is Timothy's cousin and Brown was Rashaun's father's girlfriend.

[9] [footnote in original text] Specifically, the jury was instructed: "A defendant has an absolute, constitutional right not to testify. He may rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt. Do not consider for any reason at all the fact that the defendant did not testify. [¶] Do not discuss that factor in your deliberations or let it influence your decision in any way."

Defense counsel contended Moore's behavior after the shooting was inconsistent with malice and showed the shooting was an accident or that, at most, Moore was guilty of involuntary manslaughter if he was either criminally negligent or unconscious due to voluntary intoxication. Counsel also claimed the jury could find the shooting was accidental by inferring Timothy's involvement in a struggle over the rifle. In rebuttal, the prosecutor argued the defense's theory of the case was inconsistent with the evidence.

*Verdict*

The jury found Moore not guilty of first degree murder, convicted him of second degree murder, and found the firearm enhancements true. Moore filed a motion for new trial, which was denied after an evidentiary hearing. The trial court sentenced Moore to an indeterminate term of 40 years to life in state prison. A timely notice of appeal followed.

ECF No. 20-9, Ex. C, at 2-8.

<u>STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA</u>

I. <u>Applicable Statutory Provisions</u>

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Section 2254(d) constitutes a "constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus." *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000). It does not, however, "imply abandonment or abdication of judicial review," or "by definition preclude relief." *Miller El v. Cockrell*, 537 U.S. 322, 340 (2003). If either prong (d)(1) or (d)(2) is satisfied, the federal court may grant relief based on a de novo finding of constitutional error. *See Frantz v. Hazey*, 533 F.3d 724, 736 (9th Cir. 2008) (en banc).

/////

7

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. *Harrington v. Richter*, 562 U.S. 86, 99-100 (2011). State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state law procedural principles to the contrary. *Id.* at 784-785 (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785.

A.    "Clearly Established Federal Law"

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. *Lockyer v. Andrade*, 538 U.S. 63, 71 72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether . . . the particular point in issue is clearly established by Supreme Court precedent." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

B.    "Contrary To" Or "Unreasonable Application Of" Clearly Established Federal Law

Section 2254(d)(1) applies to state court adjudications based on purely legal rulings and mixed questions of law and fact. *Davis v. Woodford*, 384 F.3d 628, 637 (9th Cir. 2003). The two clauses of § 2254(d)(1) create two distinct exceptions to AEDPA's limitation on relief. *Williams*, 529 U.S. at 404-05 (the "contrary to" and "unreasonable application" clauses of (d)(1) must be given independent effect, and create two categories of cases in which habeas relief remains available).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." *Id.* at 405. This includes use of the wrong legal rule or analytical framework. "The addition, deletion, or alteration of a factor in a test established by the Supreme Court also constitutes a failure to apply

controlling Supreme Court law under the 'contrary to' clause of the AEDPA." *Benn v. Lambert*, 283 F.3d 1040, 1051 n.5 (9th Cir. 2002). *See, e.g., Williams*, 529 U.S. at 391, 393 95 (Virginia Supreme Court's ineffective assistance of counsel analysis "contrary to" *Strickland*[10] because it added a third prong unauthorized by *Strickland*); *Crittenden v. Ayers*, 624 F.3d 943, 954 (9th Cir. 2010) (California Supreme Court's *Batson*[11] analysis "contrary to" federal law because it set a higher bar for a prima facie case of discrimination than established in *Batson* itself); *Frantz*, 533 F.3d at 734 35 (Arizona court's application of harmless error rule to *Faretta*[12] violation was contrary to U.S. Supreme Court holding that such error is structural). A state court also acts contrary to clearly established federal law when it reaches a different result from a Supreme Court case despite materially indistinguishable facts. *Williams*, 529 U.S. at 406, 412 13; *Ramdass v. Angelone*, 530 U.S. 156, 165 66 (2000) (plurality op'n).

A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407-08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 21 (2003). This does not mean, however, that the § (d)(1) exception is limited to applications of federal law that "reasonable jurists would all agree is unreasonable." *Williams*, 529 U.S. at 409 (rejecting Fourth Circuit's overly restrictive interpretation of "unreasonable application" clause). State court decisions can be objectively unreasonable when they interpret Supreme Court precedent too restrictively, when they fail to give appropriate consideration and weight to the full body of available evidence, and when they proceed on the basis of factual error. *See, e.g., Williams*, 529 U.S. at 397-98; *Wiggins*, 539 U.S. at 526 28 & 534; *Rompilla v. Beard*, 545 U.S. 374, 388 909 (2005); *Porter v. McCollum*, 558 U.S. 30, 42 (2009).

---

[10] *Strickland v. Washington*, 466 U.S. 668 (1984).

[11] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[12] *Faretta v. California*, 422 U.S. 806 (1975).

9

The "unreasonable application" clause permits habeas relief based on the application of a governing principle to a set of facts different from those of the case in which the principle was announced. *Lockyer*, 538 U.S. at 76. AEDPA does not require a nearly identical fact pattern before a legal rule must be applied. *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). Even a general standard may be applied in an unreasonable manner. *Id.* In such cases, AEDPA deference does not apply to the federal court's adjudication of the claim. *Id.* at 948.

Review under § 2254(d) is limited to the record that was before the state court. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it. *Id.* In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." *Id.* at 1399.

Where the state court's adjudication is set forth in a reasoned opinion, § 2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis." *Frantz*, 533 F.3d at 738 (emphasis in original). A different rule applies where the state court rejects claims summarily, without a reasoned opinion. In *Harrington*, *supra*, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny. *Harrington*, 562 U.S. at 101-102.

C.     "Unreasonable Determination Of The Facts"

Relief is also available under AEDPA where the state court predicated its adjudication of a claim on an unreasonable factual determination. Section 2254(d)(2). The statute explicitly limits this inquiry to the evidence that was before the state court.

Even factual determinations that are generally accorded heightened deference, such as credibility findings, are subject to scrutiny for objective reasonableness under § 2254(d)(2). For example, in *Miller El v. Dretke*, 545 U.S. 231 (2005), the Supreme Court ordered habeas relief where the Texas court had based its denial of a *Batson* claim on a factual finding that the prosecutor's asserted race neutral reasons for striking African American jurors were true. *Miller El*, 545 U.S. at 240.

/////

10

An unreasonable determination of facts exists where, among other circumstances, the state court made its findings according to a flawed process – for example, under an incorrect legal standard, or where necessary findings were not made at all, or where the state court failed to consider and weigh relevant evidence that was properly presented to it. *See Taylor v. Maddox*, 366 F.3d 992, 999 1001 (9th Cir.), *cert. denied*, 543 U.S. 1038 (2004). Moreover, if "a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in a 'unreasonable determination' of the facts" within the meaning of § 2254(d)(2). *Id.* at 1001; *accord Nunes v. Mueller*, 350 F.3d 1045, 1055 (9th Cir. 2003) (state court's factual findings must be deemed unreasonable under section 2254(d)(2) because "state court . . . refused Nunes an evidentiary hearing" and findings consequently "were made without . . . a hearing"), *cert. denied*, 543 U.S. 1038 (2004); *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) ("state courts could not have made a proper determination" of facts because state courts "refused Killian an evidentiary hearing on the matter"), *cert. denied*, 537 U.S. 1179 (2003).

A state court factual conclusion can also be substantively unreasonable where it is not fairly supported by the evidence presented in the state proceeding. *See, e.g., Wiggins*, 539 U.S. at 528 (state court's "clear factual error" regarding contents of social service records constitutes unreasonable determination of fact); *Green v. LaMarque*, 532 F.3d 1028 (9th Cir. 2008) (state court's finding that the prosecutor's strike was not racially motivated was unreasonable in light of the record before that court); *Bradley v. Duncan*, 315 F.3d 1091, 1096 98 (9th Cir. 2002) (state court unreasonably found that evidence of police entrapment was insufficient to require an entrapment instruction), *cert. denied*, 540 U.S. 963 (2003).

II.     The Relationship Of § 2254(d) To Final Merits Adjudication

To prevail in federal habeas proceedings, a petitioner must establish the applicability of one of the § 2254(d) exceptions and also must also affirmatively establish the constitutional invalidity of his custody under pre AEDPA standards. *Frantz v. Hazey*, 533 F.3d 724 (9th Cir. 2008) (en banc). There is no single prescribed order in which these two inquiries must be

/////

1  conducted. *Id.* at 736 37. The AEDPA does not require the federal habeas court to adopt any one

2  methodology. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

3      In many cases, § 2254(d) analysis and direct merits evaluation will substantially overlap.

4  Accordingly, "[a] holding on habeas review that a state court error meets the § 2254(d) standard

5  will often simultaneously constitute a holding that the [substantive standard for habeas relief] is

6  satisfied as well, so no second inquiry will be necessary." *Frantz*, 533 F.3d at 736. In such cases,

7  relief may be granted without further proceedings. *See, e.g., Goldyn v. Hayes*, 444 F.3d 1062,

8  1070 71 (9th Cir. 2006) (finding § 2254(d)(1) unreasonableness in the state court's conclusion

9  that the state had proved all elements of the crime, and granting petition); *Lewis v. Lewis*, 321

10  F.3d 824, 835 (9th Cir. 2003) (finding § 2254(d)(1) unreasonableness in the state court's failure

11  to conduct a constitutionally sufficient inquiry into a defendant's jury selection challenge, and

12  granting petition); *Williams v. Ryan*, 623 F.3d 1258 (9th Cir. 2010) (finding § 2254(d)(1)

13  unreasonableness in the state court's refusal to consider drug addiction as a mitigating factor at

14  capital sentencing, and granting penalty phase relief).

15      In other cases, a petitioner's entitlement to relief will turn on legal or factual questions

16  beyond the scope of the § 2254(d) analysis. In such cases, the substantive claim(s) must be

17  separately evaluated under a de novo standard. *Frantz*, 533 F.3d at 737. If the facts are in dispute

18  or the existence of constitutional error depends on facts outside the existing record, an evidentiary

19  hearing may be necessary. *Id.* at 745; *see also Earp*, 431 F.3d 1158 (remanding for evidentiary

20  hearing after finding § 2254(d) satisfied).

21                              DISCUSSION

22      I.      Juror Misconduct

23      After the jurors rendered their verdict, petitioner moved for a new trial. ECF No. 20-2

24  (Clerk's Transcript Vol. 2) at 10 – 11. The motion was based on juror affidavits which indicated

25  that misconduct had occurred during deliberations. *Id.* at 13. There are two separate instances of

26  purported misconduct at issue. Prior to examining each issue, the court finds it useful to

27  reproduce the state court of appeal's summation of the background surrounding juror misconduct

28  and the motion for new trial:

On the day after the jury delivered its verdict, the trial court's judicial assistant received a call from Juror No. 3, who indicated he had "second thoughts about the verdict and [believed] that the jury came to the wrong conclusion." Moore moved for a new trial, on the grounds of, inter alia, alleged juror misconduct. Moore relied on declarations from Juror Nos. 3 and 10 stating the jury had discussed Moore's failure to testify. Juror No. 3 declared: "Jurors #7, 9, and 10 discussed during deliberations that [Moore] did not testify. They stated that they would have understood the holes in the story of this case better if [Moore] had testified. These three jurors also stated that [Moore's] failure to testify supported their belief and their verdict that he was guilty of murder."

Juror No. 10 declared: "During the course of deliberations, the jury spent at least four hours over the several days of deliberations discussing the fact that [Moore] did not take the stand. This was a recurring topic that the jury returned to many times during deliberations. Included in these conversations were statements that the case involved many unexplained questions that could have been answered had [Moore] taken the stand and testified. Additionally, it was discussed that [Moore] should have tried to protect his innocence by taking the stand and that he should have testified because he was on trial for murder. It was also discussed that had [Moore] taken the stand and testified regarding what occurred, it would have likely helped to lessen his degree of culpability. The jury also discussed the fact that [Moore] must not have taken the proceedings seriously as he did not take the stand in his defense. Finally, it was discussed that [Moore] seemed genuinely sympathetic on the 911 call and that, had he taken the stand in his own defense, the jury would have better understood what was on his mind and the outcome of the trial would likely have been different."

The People opposed Moore's motion, supporting their opposition with declarations from Jurors Nos. 2, 3, 5, 8, 9, and 10. Juror No. 2 declared: "During deliberations the subject of [Moore's] failure to testify came up twice. [¶] When the subject arose, at least three people reminded the jury [Moore's] failure to testify cannot be taken into account. [¶] . . . [J]urors explained the court instructed them not to allow [Moore's] failure to testify to sway their judgment because it is the burden of the prosecutor to prove the defendant committed the crime. [¶] I would not characterize the subject as being 'discussed' during deliberations. I would call it one of those 'quick things.' [¶] There was no agreement between the Jury to disregard the Judges [sic] instructions regarding [Moore's] failure to testify. [¶] I personally reminded the jury of the [trial court's] instruction . . . ."

Declarations of Juror Nos. 5 and 8 were similar. Juror No. 5 stated: "During the course of the Jury's deliberations I heard brief comments from jurors about [Moore's] failure to testify. [¶] These comments did not last very long and I certainly do not remember anyone talking about the topic for hours at a time. [¶] At no time during the deliberations did I mention [Moore's] failure to testify had an effect on my decision. [¶] I did not observe any of the jurors mention [Moore's] failure to testify was affecting their decision making process during the course of the deliberations. [¶] There was no

explicit or implicit agreement . . . to disregard the Court's instruction regarding [Moore's] failure to testify." Juror No. 8 stated: "During the deliberations three of the jurors discussed [Moore's] failure to testify for a few minutes if that. [¶] There was no explicit or implicit agreement among the Jury to disregard the Court's instruction regarding [Moore's] failure to testify. [¶] Some of the jurors spoke out and reminded the Jury [Moore] has the right not to take the stand and it was up to the District Attorney to prove his case."

Juror No. 9 declared: "One of the juror[s] indicated they wished [Moore] would have testified. [¶] The other jurors immediately responded the Judge instructed us that you cannot hold that against the defendant. [¶] I never stated [Moore's] failure to testify supported my belief of what happened and that [Moore] was guilty of murder. [¶] The other jurors also responded the jury needs to piece together the facts based upon the evidence that had been received during the trial. [¶] The discussion about [Moore's] failure to testify lasted seconds. The discussion lasted at most ten seconds. [¶] There was no agreement by the jury to disregard the courts instructions on any point of law." Juror No. 3 also submitted a declaration in support of the People's opposition, in which he stated: "During deliberations the Jury briefly discussed [Moore's] failure to testify for less than five minutes. Prior to Juror #10's remark that we had to 'fill in holes' there was additional discussion to the effect that if [Moore] had testify [sic] a lot of questions could have been answered. [We] discussed this topic for some time. [¶] There was no agreement . . . to disregard the Judges [sic] instructions regarding [Moore's] failure to testify."

Juror No. 10's declaration in support of the opposition provides: "[Moore's] failure to testify came up within the context of trying to determine what transpired. [¶] . . . [¶] I reminded my fellow jurors this is not a moral court and we must decide the case based on the facts and the law as it is written. [¶] I never stated that [Moore's] failure to testify supported my belief on the case and my verdict that [Moore] was guilty of murder. [¶] . . . [¶] There was no explicit agreement among the Jury to disregard the Court's instruction regarding [Moore's] failure to testify."

Moore filed a reply, with additional supporting declarations from Jurors Nos. 3, 5, and 10. In support of Moore's reply, Juror No. 3 declared: "The topic of [Moore's] failure to testify was not, and was far from, just a matter of seconds, nor was it a mere comment, but addressed and discussed in detail. I did not hear any juror actually stop further discussion regarding [Moore's] failure to testify. The discussion regarding the failure to testify was significant in length, as it was a recurring topic. . . . [M]ore than one juror discussed this topic and its affect [sic] reaching their verdicts." Juror No. 5 also declared: "It was discussed several times during deliberations that [Moore] did not testify. Members of the jury expressed that they would have understood the holes in the story of this case better if [Moore] had testified. These discussions lasted approximately 30 minutes."

/////

14

Juror No. 10 declared: "[Moore's] failure to testify came up as the jurors discussed what happened on the night of the incident and as jurors discussed the holes in the story and unexplained questions. The holes and unexplained questions, and the attempt to fill in these holes and answer the questions—including speculation as to what transpired on the night of the incident were discussed for a significant amount of time . . . . Furthermore, jurors continually came back to the issue that [Moore] had not testified to fill in the holes and unexplained questions during this time . . . . Some jurors also commented that [Moore] did not look like a person who would commit this crime intentionally, and that if he had taken the stand and explained his story and filled in missing information, it would help to lessen his culpability. [¶] During the recurring discussions about [Moore's] failure to testify, there was in fact additional discussion by the jury that had [Moore] taken the stand and testified it would have likely helped to lessen his degree of culpability . . . ."

The prosecution filed additional declarations from Juror Nos. 2, 5, 8, and 9. Juror No. 9 declared: "During deliberations, I did not hear any juror state if [Moore] had taken the stand it would help lessen his 'culpability.' The two topics were not discussed together. [¶] During deliberations, I remember Juror #6 state, 'I just wish he would have testified because then we would have heard his side of the story.' As soon as Juror #6 stated this, other jurors reminded him we need to go by the evidence presented at trial. [¶] During deliberations I did not hear any member of the jury state [Moore] should have testified to protect his innocence and he should have testified because he was on trial for murder. [¶] During deliberations I did not hear any member of the jury state [Moore] did not take the stand; therefore he must be guilty of murder. [¶] During deliberations I did not hear any member of the jury state the reason I believe [Moore] is guilty of murder is because of his failure to testify." Additional declarations by Juror Nos. 2, 5, and 8 were substantially the same.

After receiving these conflicting declarations and indicating that some additional portions of the declarations were inadmissible, the trial court tentatively found Moore established a rebuttable presumption prejudicial misconduct had occurred. An evidentiary hearing was held at the People's request to resolve conflicts in the declarations and determine if the People had rebutted the presumption of prejudice.

To that end, in January 2014, Juror Nos. 3 and 7 were examined by the court. Juror No. 3 testified that, after the jury had eliminated first degree murder, but before a verdict had been reached on second degree murder and they were discussing Moore's motive and intent. He reported that Juror No. 10 said "we were filling in the holes in the case because we . . . didn't have the testimony from [Moore], and so we were trying to fill in what happened that night." Other jurors "chimed in" that "[i]t would have been a lot easier to be able to get the full picture . . . if they had testimony from [Moore]." When asked how long the discussion of the subject went on, Juror No. 3 said, "It was a lot longer than [five minutes]. I would say at least a half hour or more but at the same time, it was kind of . . . a common thread throughout the whole discussion." Juror No. 3 said to other jurors:

"[O]bviously, it would have been a lot easier to be able to . . . gather all that [missing] information . . . if [Moore] would have testified." According to Juror No. 3, another juror reminded them they should not consider Moore's failure to testify, but it kept coming up. Juror No. 3 did not remember anyone saying that Moore's failure to testify supported their belief he was guilty. However, Juror No. 3 himself suggested to other jurors that they could have understood Moore's motive and intent if he had testified. The other jurors expressed Moore's testimony would have been helpful "to understand the whole situation," but no one expressly said they were considering Moore's failure to testify in reaching a decision. However, Juror No. 3 said Juror No. 10 told him at some point after the individual jurors were polled but before a final verdict was reached, that it would have been "a different story" if Moore had testified.

Juror No. 7 testified that, on the first day of deliberations before the jury reached a decision regarding first degree murder, "one of the jurors made a comment that it would have been easier if we heard [Moore] testify," and Juror No. 7 said, "I agree." Although Juror No. 7 and another juror expressly cautioned that Moore's failure to testify should not be held against him, the subject came up a second time later that same day. The subject only came up twice and probably took about "[e]ight seconds" in passing comments. Juror No. 7 did not recall any juror saying Moore should have testified if he wanted to defend himself, protect his innocence, or lessen his culpability.

The trial court also examined Juror Nos. 9 and 10. Juror No. 9 heard only Juror No. 10 mention Moore's decision not to testify. This discussion lasted "just a few seconds." Juror No. 9 could not clearly remember when the discussion took place, but his best recollection was the discussion took place after they had reached a decision on first degree murder but before they had made a decision on second degree murder. Juror No. 9 and another juror said, "We can't consider that." Juror No. 9 did not hear any juror indicate that, if Moore had testified, it would have helped lessen his culpability. Nor did Juror No. 9 hear anyone say that Moore's failure to testify indicated he was trying to hide something or did not take the proceedings seriously. However, Juror No. 10 did say that, if Moore had testified, it would have filled some of the holes in the story. Juror No. 10 "said at the same time we need to go by what the Judge said." Thereafter, the conversation "died down" and the jurors switched topics.

Juror No. 10 testified that Moore's decision not to testify was discussed for approximately two to four hours over the course of two days of deliberations. "If we added up all the time. Because sometimes we got through the day and somebody would bring something else up again. And we would have to go back and say, we can't think about that. We have to go off what we have in front of us." Juror No. 10 remembered: "[A] couple of [female jurors] saying that they didn't understand why he didn't get up there and testify for himself. [¶] But then my comment, after that, it would be well, we have to actually deal with what is presented to us and what is given to us. We can't go off what we think or what we think he might have said or anything like that. We have to go with the evidence that is in

front of us." One of the jurors said Moore should have tried to protect his innocence by taking the stand. On the first day of deliberations, before a decision was reached regarding first degree murder, someone expressed Moore would have likely helped to lessen his degree of culpability if he had testified.

When asked to explain the context of the discussion, Juror No. 10 explained: "[B]efore we walked back there, [the prosecutor] said that [defense counsel] has these holes and she wants you guys to fill them in. And when we went back there, they were kind of discussing if he had . . . testified for himself . . . . And I said, 'remember what he said, [the prosecutor],' they were like, yeah, I said, 'we can't, you know, just come up with our answers.' You know, I said, 'we have to sit here and actually go off what we have in front of us.'' Juror No. 10 was asked, "[D]o you understand what they meant by would lessen the degree of culpability?" Juror No. 10 answered, "That maybe the information that we had on paper, maybe that it wouldn't be a second degree or first degree, maybe manslaughter, involuntary manslaughter or something like that. Not second degree murder or first degree murder."

Juror No. 10 also testified that, when the jury was discussing whether Moore committed first degree murder, second degree murder, or involuntary manslaughter, two female jurors said, "[Moore] didn't look like the type of person that would do that type of crime. But it would have helped him out if he would had spoke for himself or got up there and said something." Juror No. 10 denied saying that Moore's failure to testify supported his belief Moore was guilty of second degree murder. Juror No. 10 mentioned two or three times that Moore's failure to testify could not be considered. Sometime during the first day of deliberations, Juror No. 10 heard someone say that Moore must not take the proceedings very seriously because he did not testify. Juror No. 10 could not remember who said this.

After the evidentiary hearing had concluded, Juror No. 3 sent a letter to the trial court, which read: "During the [January 13] hearing your honor asked me if juror number ten had stated that [Moore's] failure to testify supported his belief that he was guilty of murder. I replied inadequately with, 'I think so.' I want to restate my response to that question and say 'yes' he did state [Moore's] failure to testify supported juror number ten's belief that [Moore] was guilty. [¶] Juror's [sic] number ten made a comment about justice not being carried out in the Trayvon Martin case and in [Moore's] case it had been carried out. Following this comment I heard juror number ten say that the *'The outcome of this case would have been a lot different if [Moore] had . . .'* and he cut his sentence short from saying '. . . had testified.' I feel his statement meant that [Moore] was guilty of murder because he had not testified in court. I strongly believe there were other jurors who heard him make this comment. . . . [¶] I want to clarify my declaration wherein jurors number seven and nine had also stated that [Moore's] failure to testify supported his belief that he was guilty of murder. Juror number seven stated during deliberations that 'we wouldn't still be here (in deliberations) if

17

[Moore] had testified.' Juror number nine stated that [Moore's] testimony would have been helpful but, 'that anyone that has a loaded gun in their home and kills someone while intoxicated accidently or not is guilty of murder.' I feel that both of these two jurors and others commented during deliberation in their own words or gestured with an affirmative nod that [Moore's] testimony would have filled in the 'holes' as mentioned previously by juror number ten." (Italics added.)

After receipt of the letter, Juror No. 3 was reexamined and affirmed his statements in the recent letter. Most importantly, Juror No. 3 made clear that Juror No. 10 did not actually finish the sentence italicized above to say "had testified." Rather, Juror No. 10's voice trailed off and Juror No. 3 had subjectively construed the remark.

The trial court denied Moore's motion for new trial. In explaining its decision, the court initially observed it had personally polled each of the 12 jurors before the verdict was orally announced and each juror personally confirmed "that was [his or her] true and correct verdict." After the jurors were polled, the court announced the verdict, which was "received very emotionally." The court said: "[T]he reason I'm putting this on the record, I actually never had that level of emotion in the courtroom. I turned and looked at this jury. They were ashen. . . . Some people were shaking."

The court further stated: "[D]uring the course of receiving some of the jury information and the declarations I found were not detailed or were inconsistent or . . . didn't make sense in terms of the context of the statements and when they were made. And context is very important because . . . we have a case where the defendant was acquitted of first degree [murder]. This jury did not hold his failure to testify against him and didn't convict him of the highest degree of crime. [¶] In the context of the closing argument, the argument advanced in closing there was a struggle. I did sustain an objection because there was no evidence of a struggle, but I did allow and we did have a discussion at the bench, arguments about the inference that there might have been a struggle. [¶] People pointed out, there are holes in that argument. It isn't inconceivable or inappropriate for the jury to consider the defense's case. That doesn't mean they are considering [Moore's] failure to testify. [¶] So there were points in time where I could see the [testifying jurors] were confused about what it was we were asking them, whether they were asking the consideration of the defendant's entire case or whether they are asking about particular statements made about the defendant['s] constitutional right not to testify. [¶] There was not sufficient time to go line by line, I am not able to do that, but . . . I spent hours and hours charting and comparing the declarations to the actual testimony and there are considerable portions of testimony that I cannot receive pursuant to [Evidence Code section] 1150. They are either hearsay, or they are deliberat[ive] process or they are subjective reasoning. I can only receive evidence that is the type of evidence that refers to . . . overt acts. [¶] So in this case, I do believe that *the defense has shown admissible evidence that there was jury misconduct* . . . there [were] overt acts prescribed by [Moore's] constitutional right not to testify as we discussed. [¶] But I believe the third part, *based upon*

> *all of the credible, believable evidence, there is no substantial likelihood of bias*, and I do believe this case is similar to [*People v. Loker* (2008) 44 Cal.4th 691, 749, 80 Cal. Rptr. 3d 630, 188 P.3d 580 (*Loker*), *Leonard*, *supra*, 40 Cal.4th at page 1425, and *Hord*, *supra*, 15 Cal. App.4th at pages 727-728.] [¶] For those reasons, *based on the credible believable evidence*, in its totality, I'll deny the Motion for New Trial based on jury misconduct." (Italics added.)

ECF No. 20-9 (Ex. C) at 13-21.

### A.    Reference to Extraneous Matters

First, petitioner points to a juror affidavit which related references to extraneous matters during deliberations.  Specifically, one affidavit indicated:

> Juror # 10 stated during deliberations that this case was similar to Dick Cheney shooting his friend in the woods except Dick Cheney wasn't drunk.  He further expressed to jurors his belief that Mr. Moore must be guilty based upon a comparison to facts involving Dick Cheney.  He also stated that in the Trayvon Martin/Zimmerman trial,[13] justice was not served.  Then he stated in this trial the jury made the right conclusion in comparison . . .

*Id.* at 44.  In a tentative ruling, the trial court stated its intent to exclude this portion of the affidavit from the evidentiary hearing insofar as it was evidence of deliberative process.  ECF No. 20-8 (Reporter's Transcript Vol. 4) at 19.  Petitioner's counsel did not object to this tentative ruling.  Moreover, although these statements were referenced in the motion for new trial, it was never argued that they were an independent basis for granting a new trial.[14]  Petitioner raised the issue on direct appeal.

/////

/////

---

[13] Petitioner states that he is Caucasian and that Brown, the victim, was African-American.  *See, e.g.*, ECF No. 20-6 (Reporter's Transcript Vol. 2) at 60.  He notes that Juror # 10 was also African-American. ECF No. 21-1 (Aug. Reporter's Transcript) at 230.

[14] Rather, the motion, with respect to juror misconduct, was premised on jurors' discussion of petitioner's failure to take the stand and their failure to "accurately and fully deliberate the charges in question."  ECF No. 20-2 (Clerk's Transcript Vol. 2) at 13.  The latter argument was bifurcated and petitioner claimed that jurors: (1) failed to deliberate insofar as they did not understand "the pivotal and controlling law of implied malice, and the intent required to prove the charges herein" and were dissuaded by the jury foreman from submitting a question on the issue to the court (*id.* at 21); and (2) failed to render a true and correct verdict insofar as one juror – Juror # 3 – stated that he was "dominated and pressured to go along with the verdict that was not in fact the true and correct verdict in his own mind" (*id.* at 23).

19

1          1.    State Court Decision

2     The state court of appeal rejected the claim as follows:

3          Moore also refers to another alleged instance of juror misconduct
           disclosed by Juror No. 3's initial declaration and contends it should
4          have been the basis for a new trial. Moore relies on statements
           purportedly made by Juror No. 10 and related by Juror No. 3.
5          Specifically, Juror No. 3 stated: "Juror #10 stated during
           deliberations that this case was similar to Dick Cheney shooting his
6          friend in the woods except that Dick Cheney wasn't drunk. He further
           expressed to the jurors his belief that [Moore] must be guilty based
7          upon a comparison [of] the facts involving Dick Cheney. He also
           stated that in the Trayvon Martin/Zimmerman trial, justice was not
8          served. Then he stated in this trial the jury made the right conclusion
           in comparison." At the evidentiary hearing, Juror No. 3 indicated the
9          statements were made after circulation of the completed verdict form
           but before final submission of the verdict.
10
           The People contend Moore forfeited this argument by failing to raise
11         the issue in his motion for new trial or press for a ruling in the trial
           court. We agree. (*See People v. Dykes*, *supra*, 46 Cal.4th at p. 808,
12         fn. 22; *People v. Masotti* (2008) 163 Cal.App.4th 504, 508, 77 Cal.
           Rptr. 3d 483 ["[a] motion for new trial may be granted only upon a
13         ground raised in the motion"]; *People v. Williams* (1957) 153
           Cal.App.2d 21, 25, 314 P.2d 42 [grounds for new trial motion "may
14         not be presented for the first time on appeal"].) Moore submitted
           Juror No. 3's declaration containing the statements regarding Dick
15         Cheney and Trayvon Martin in support of his motion for new trial.
           The statements are also briefly referenced on one page of the
16         memorandum in support of motion for new trial. However, such
           statements were never asserted to be an independent basis for
17         granting the motion for new trial.

18         Furthermore, as Moore recognizes in his reply brief, the trial court's
           tentative ruling stated its intent to strike the currently challenged
19         portion of Juror No. 3's declaration as inadmissible evidence of
           deliberative process. It explained: "[T]he court is not considering any
20         of the deliberations or the thinking process of any of the jurors. That
           is beyond the scope of something this Court could consider. [¶] . . .
21         [¶] So there are aspects of these declarations that I do intend to strike
           because they are beyond something this Court can consider." The
22         trial court made clear that, although the evidentiary hearing would be
           limited to considering overt acts regarding Moore's decision not to
23         testify, the parties could secure a final ruling after the evidentiary
           hearing. Nevertheless, Moore did not object to this tentative ruling,
24         or otherwise raise the issue, other than to suggest the statements gave
           corroborating context for his other jury misconduct claims.
25
           In any event, we review the trial court's admissibility determination
26         for an abuse of discretion. (*Barboni v. Tuomi* (2012) 210 Cal.App.4th
           340, 345, 148 Cal. Rptr. 3d 581.) Even if Moore did not forfeit the
27         instant claim, we cannot agree the trial court abused its discretion by

28

excluding this evidence of alleged misconduct.[15] We are not persuaded by Moore's claim that Juror No. 10's statements are admissible as "overt acts." Moore contends Juror No. 10's statements constituted evidence that the jurors were improperly exposed to extraneous information outside the evidence and the statements themselves constitute misconduct because they show Juror No. 10, who is African American, was actually influenced by such outside information and racially biased against Moore.

The facts of this case have little in common with the authority on which Moore relies to support this position. (*See In re Stankewitz*, *supra*, 40 Cal.3d at pp. 396, 398-400 [juror's erroneous legal advice to other jurors was admissible evidence of misconduct]; *Grobeson v. City of Los Angeles*, *supra*, 190 Cal.App.4th at pp. 784, 790-791 [juror's statement during trial that she had made up her mind and was not going to listen to "the rest of the stupid argument" was admissible evidence of misconduct]; *Clemens v. Regents of University of California* (1971) 20 Cal.App.3d 356, 363, 97 Cal. Rptr. 589 [juror's statement "nobody is never going to change my mind" was admissible evidence of misconduct].)

That Juror No. 10 made the statements attributed to him by Juror No. 3 is not misconduct in and of itself. Juror No. 10's statement does not, by itself, show a juror injected facts or law about Moore's case that were outside the evidence. (*See People v. Nesler*, *supra*, 16 Cal.4th at p. 578 ["[j]uror misconduct, such as the receipt of information about a party or the case that was not part of the evidence received at trial, . . . may establish juror bias" (italics added)].) Nor do the statements show Juror No. 10 prejudged Moore's case. Moore's briefing itself makes clear he sought to have Juror No. 3's recitation of Juror No. 10's out of court statements considered "as a reflection on why [Juror No. 10] would support a verdict of second degree murder." Accordingly, we agree with the People that the challenged portion of Juror No. 3's declaration was inadmissible to impeach the verdict. (*See People v. Duran* (1996) 50 Cal.App.4th 103, 113, 57 Cal. Rptr. 2d 635 ["when a juror in the course of deliberations gives the reasons for his or her vote, the words are simply a verbal reflection of the juror's mental processes"]; *People v. Danks*, *supra*, 32 Cal.4th at p. 302 [same]; *People v. Lewis* (2001) 26 Cal.4th 334, 391, 110 Cal. Rptr. 2d 272, 28 P.3d 34 [juror statement sharing personal religious view and how he reconciled his vote for death penalty is inadmissible].)

The excluded portion of Juror No. 3's declaration relates solely to Juror No. 10's mental processes and subjective reasoning. The court did not abuse its discretion in excluding such evidence.

ECF No. 20-9 (Ex. C) at 29 – 31. Petitioner raised this claim in a petition for review to the

---

[15] [footnote thirteen in original text] For the first time in his reply brief, Moore suggests he received ineffective assistance of counsel if his trial counsel forfeited the instant argument. Moore has not shown a good reason for waiting until his reply brief to raise an ineffective assistance of counsel claim. However, we need not consider the argument.

21

California Supreme Court (ECF No. 20-13 (Ex. G) at 15; the petition was summarily denied (ECF No. 20-14 (Ex. H)).

### 2. Relevant Federal Law

Federal habeas corpus relief is not available to correct alleged errors in a state court's application or interpretation of state law. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'"); With respect to the admissibility of evidence, the Supreme Court has held that "[t] accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988); *see also Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) ("The accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.").

Apart from the state rules applied by California courts, there are indicators of established federal law within the meaning of AEDPA with respect to juror statements regarding deliberations. Addressing the issue, federal courts have routinely relied on Federal Rule of Evidence 606(b), which dictates:

> "Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, [or] (2) whether any outside influence was improperly brought to bear upon any juror . . . . A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying."

Fed. R. Evid. 606(b). The United States Supreme Court has held that the foregoing was applicable to juror affidavits which petitioners sought to introduce at a post-verdict hearing. *See Tanner v. United States*, 483 U.S. 107, 121 (1987) ("Petitioners have presented no argument that

/////

/////

22

Rule 606(b) is inapplicable to the juror affidavits and the further inquiry they sought in this case, and, in fact, there appears to be virtually no support for such a proposition.").[16]

### 3. Analysis

As an initial matter, the parties dispute whether this claim is procedurally defaulted. The claim plainly fails on its merits, however, and the court elects to recommend its dismissal on those terms. *See Reed v. Ross*, 468 U.S. 1, 9 (1984) ("Our decisions have uniformly acknowledged that federal courts are empowered under 28 U. S. C. § 2254 to look beyond a state procedural forfeiture and entertain a state prisoner's contention that his constitutional rights have been violated.").

Turning to the merits, this court cannot grant relief based on any assertion that the state courts erred in applying state law. *See Estelle*, 502 U.S. at 67-68. Thus, the only pertinent question is whether the trial court's exclusion of this evidence in weighing the motion for new trial violated petitioner's rights under federal law. It did not.

First, the comments made by Juror # 10 are not the sort of "extraneous information" for which 606(b) provides an escape hatch. The shooting mishap related to former vice president Dick Cheney and the acquittal of George Zimmerman in the shooting of Trayvon Martin were events well-covered by news media and fall within the public's general knowledge. The Ninth Circuit has held that "[t]he type of after-acquired information that potentially taints a jury verdict should be carefully distinguished from the *general knowledge, opinions, feelings, and bias that every juror carries into the jury room.*" *Hard v. Burlington Northern R. Co.*, 870 F.2d 1454, 1461 (9th Cir. 1989) (emphasis added). Although the role of the jury in our justice system is to

---

[16] The discussion of 606(b), though obviously separate from the state rules applied by California courts, is an obvious indicator of established federal law within the meaning of AEDPA.

The court notes that Cal. Evid. Code § 1150(a) is similar to 606(b) and provides that: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." *See generally In re Hamilton*, 20 Cal. 4th 273, 294 (1999).

render a verdict after impartial consideration of the facts, it would be neither realistic nor reasonable to expect jurors to forget the world in which they live when they begin their deliberations.

Instead, the comments attributed to Juror # 10 pertain, as the state court of appeal reasonably concluded, to his mental processes and subjective reasoning. His statements are appropriately read as part and parcel of his "deliberative process." And the deliberative process lies outside the bounds of 606(b). *See Tarango v. McDaniel*, 837 F.3d 936, 947 (9th Cir. 2016) ("[C]ourts universally prohibit jurors from impeaching their own verdicts through evidence of their internal deliberative process.").

Petitioner notes that the Supreme Court's recent *Pena-Rodriguez* decision announced an exception to the foregoing rule on piercing the deliberative process. *Pena-Rodriguez* held that the no-impeachment rule is excepted "when a juror's statements indicate that racial animus was a significant motivating factor in his or her finding of guilt." 137 S. Ct. 855, 867 (2017). The High Court reasoned:

> In the years before and after the ratification of the Fourteenth Amendment, it became clear that racial discrimination in the jury system posed a particular threat both to the promise of the Amendment and to the integrity of the jury trial. . . .
>
> Permitting racial prejudice in the jury system damages both the fact and the perception of the jury's role as a vital check against the wrongful exercise of power by the State. . . .
>
> Racial bias of the kind alleged in this case differs in critical ways from the compromise verdict in *McDonald*, the drug and alcohol abuse in *Tanner*, or the pro-defendant bias in *Warger*. The behavior in those cases is troubling and unacceptable, but each involved anomalous behavior from a single jury—or juror—gone off course. Jurors are presumed to follow their oath and neither history nor common experience show that the jury system is rife with mischief of these or similar kinds. . . .
>
> The same cannot be said about racial bias, a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice.

*Id.* at 867-68 (citations and internal quotation marks omitted). But *Pena-Rodriguez*, unlike this case, concerned statements whose racial animus was unambiguous. The Supreme Court summarized the offending statements:

The affidavits by the two jurors described a number of biased statements made by another juror, identified as Juror H. C. According to the two jurors, H. C. told the other jurors that he "believed the defendant was guilty because, in [H. C.'s] experience as an ex-law enforcement officer, Mexican men had a bravado that caused them to believe they could do whatever they wanted with women." The jurors reported that H. C. stated his belief that Mexican men are physically controlling of women because of their sense of entitlement, and further stated, "'I think he did it because he's Mexican and Mexican men take whatever they want.'" According to the jurors, H. C. further explained that, in his experience, "nine times out of ten Mexican men were guilty of being aggressive toward women and young girls." Finally, the jurors recounted that Juror H. C. said that he did not find petitioner's alibi witness credible because, among other things, the witness was "'an illegal.'" (In fact, the witness testified during trial that he was a legal resident of the United States.)

*Id.* at 862. The Supreme Court ultimately noted that its holding in *Pena-Rodriguez* applied to *clear* statements of racial bias. *Id.* at 869 ("[T]he Court now holds that where a juror *makes a clear statement* that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee.") (emphasis added). Juror # 10's statements are simply not analogous. He made no explicit statements regarding petitioner's race. He referred to the shooting of Trayvon Martin – an incident that obviously inflamed racial tensions, but he also referred to the Dick Cheney incident, which had no obvious racial overtones. *At best*, one might infer that Juror #10's decision to convict was based on his belief that Zimmerman's acquittal was a racial injustice that required redress. But *Pena-Rodriguez* does not authorize courts to sift through juror statements for hints of racial bias. Indeed, it explicitly cautioned against such action:

Not every offhand comment indicating racial bias or hostility will justify setting aside the no-impeachment bar to allow further judicial inquiry. For the inquiry to proceed, there must be a showing that one or more jurors made statements exhibiting *overt racial bias* that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict. To qualify, the statement must tend to show that racial animus was a significant motivating factor in the juror's vote to convict. Whether that threshold showing has been satisfied is a matter committed to the substantial discretion of the trial court in light of all the circumstances, including the content and timing of the alleged statements and the reliability of the proffered evidence.

25

*Id.*

For the foregoing reasons, this claim should be denied.

### B. Juror's Discussion of Petitioner's Failure to Testify

Next, petitioner argues that the trial court erred when it found no substantial prejudice from the jury's discussion of his failure to testify. There was no question that the jurors discussed petitioner's failure to testify. Petitioner's motion for new trial argued that this discussion warranted a new trial. ECF No. 20-2 (Clerk's Transcript Vol. 2) at 16-20. The trial court ultimately found, however, that "based upon all of the credible, believable evidence," there was no substantial likelihood of bias resulting from this juror misconduct. ECF No. 20-8 (Reporter's Transcript Vol. 4) at 258. Petitioner appealed this finding.

### 1. State Court Decision

The court of appeal rejected this claim as follows:

"The Fifth Amendment to the federal Constitution provides that no person 'shall be compelled in any criminal case to be a witness against himself.' . . . Thus, the Fifth Amendment entitles a criminal defendant, upon request, to an instruction that will 'minimize the danger that the jury will give evidentiary weight to a defendant's failure to testify.' (*Carter v. Kentucky* (1981) 450 U.S. 288, 305, 101 S. Ct. 1112, 67 L. Ed. 2d 241.)" (*Leonard*, *supra*, 40 Cal.4th at pp. 1424-1425.) "[T]he purpose of the rule prohibiting jury discussion of a defendant's failure to testify is to prevent the jury from drawing adverse inferences against the defendant, in violation of the constitutional right not to incriminate oneself." (*Id.* at p. 1425.) It is undisputed the jurors did discuss Moore's failure to testify, in violation of the trial court's instruction, and this constituted misconduct. (*People v. Lavender* (2014) 60 Cal.4th 679, 687, 181 Cal. Rptr. 3d 28, 339 P.3d 318.) The only question before us is whether the presumption of prejudice was rebutted. Moore argues the trial court erred when it found no substantial likelihood of prejudice from the jury's discussion of his failure to testify. We disagree.

Moore contends: "The court's prejudice analysis . . . was deeply flawed. That analysis did not rest on any finding that the extensive discussions of the prohibited subject . . . had not occurred, but rather on the fact that [Moore] had been 'acquitted of first degree [murder]. This jury did not hold [Moore's] failure to testify against him and didn't convict him of the highest degree crime.' [¶] As a factual matter, it is impossible to reconcile the trial court's assumption that the prohibited matter was only considered in assessing the first degree charge as opposed to [the jury's] selection among lesser alternatives." The People disagree, insisting the trial court's ruling is clear that it found Juror No. 3 not credible and credited only the testimony and declarations of Juror Nos. 2, 5, 7, 8, 9, and 10.

As stated previously, our role is to independently assess the "legal import" of the facts found by the trial court. (*People v. Cissna*, *supra*, 182 Cal.App.4th at p. 1118, italics omitted.) In doing so, we must accept "the trial court's factual findings and credibility determinations [that] are supported by substantial evidence." (*People v. Dykes*, *supra*, 46 Cal.4th at p. 809.) Our review has been made unnecessarily difficult because the trial court did not explicitly state its final evidentiary rulings, factual findings, or credibility determinations on the record. (*See People v. Barnwell* (2007) 41 Cal.4th 1038, 1053, 63 Cal. Rptr. 3d 82, 162 P.3d 596 ["[a] trial court facilitates review when it expressly sets out its analysis of the evidence"].) Nevertheless, when a trial court denies a motion for new trial, we presume the order is correct. "'"[A]ll intendments are indulged in to support it on matters as to which the record is silent, and error must be affirmatively shown." [Citation.] We must "view the record in the light most favorable to the trial court's ruling and defer to its findings of historical fact, whether express or implied, if they are supported by substantial evidence."'" (*Jie v. Liang Tai Knitwear Co*. (2001) 89 Cal.App.4th 654, 666, 107 Cal. Rptr. 2d 682, italics added; accord, *People v. Carpenter* (1999) 21 Cal.4th 1016, 1045-1046, 90 Cal. Rptr. 2d 607, 988 P.2d 531 [order denying motion to suppress]; *Grobeson v. City of Los Angeles*, *supra*, 190 Cal.App.4th at p. 794.) "We do not seek out inferences that, if true, would cause us to reverse the trial court's order granting the motion for a new trial." (*Grobeson*, at p. 795.)

Moore asks us to flip this standard on its head. In challenging the trial court's prejudice analysis, Moore assumes the court relied on a factual finding the jury only discussed his decision not to testify when assessing the first degree murder charge—a finding that is not supported by substantial evidence. Moore points out that Juror No. 3 was clear that the discussion took place after a decision had been reached to acquit Moore of first degree murder, but before a verdict had been reached on second degree murder, and thus insists "the trial court's attempt to draw significance from the jurors' rejection of the first degree murder charge is logically unfounded." Moore's argument is misguided. The trial court never stated such a finding and we will not presume it made a finding unsupported by substantial evidence. (*See Jie v. Liang Tai Knitwear Co.*, *supra*, 89 Cal.App.4th at pp. 666-667; *Grobeson v. City of Los Angeles*, *supra*, 190 Cal.App.4th at p. 794.) What the trial court did say is that, "based upon all of the credible, believable evidence . . . this case is similar to [*Loker*, *supra*, 44 Cal.4th at page 749, *Leonard*, *supra*, 40 Cal.4th at page 1425, and *Hord*, *supra*, 15 Cal.App.4th at pages 727-728.]" In order to discern the facts found by the trial court, we turn to a discussion of this authority.

It is settled law that "[t]ransitory comments of wonderment and curiosity" about a defendant's failure to testify, although technically misconduct, "are normally innocuous, particularly when a comment stands alone without any further discussion." (*Hord*, *supra*, 15 Cal.App.4th at pp. 727-728.) "When comments go beyond natural curiosity and their content suggests inferences from forbidden areas, the chance of prejudice increases. For example, if a juror were to say, 'The defendant didn't testify so he is guilty,' or 'we will have to find

the defendant guilty of the greatest charges to ensure he will be adequately punished,' the comments go beyond mere curiosity and lean more toward a juror's drawing inappropriate inferences from areas which are off limits." (*Id.* at pp. 728.) On the other hand, "a reminder to the jury of the court's instructions to disregard a defendant's decision not to testify is, in the absence of objective evidence establishing a basis to question the effectiveness of the reminder . . . , strong evidence that prejudice does not exist." (*People v. Lavender*, *supra*, 60 Cal.4th at p. 687.)

In *Hord*, *supra*, 15 Cal.App.4th 711, misconduct was found despite a conflict among the jurors regarding whether they discussed the defendant's choice not to testify. (*Id.* at pp. 721-722, 725.) Specifically, some jurors did not recall any such discussion, another four recalled comments being made, and three of the latter jurors recalled the foreperson immediately advising they could not consider the defendant's failure to testify. (*Id.* at pp. 721-722.)

After independent review, our Supreme Court determined the misconduct did not pose a substantial likelihood of prejudice. The Hord court explained: "Here, during deliberations there was a comment or comments made about [the] defendant's not testifying and a comment regarding [the] defendant's sentence. Although these matters were not to be discussed, the discussion was very different than when a juror performs experiments or brings in new law or facts into deliberations. The jury was obviously well aware here that defendant did not testify and equally aware that he would be punished if the jury found him to be guilty. Thus the comments did not interject any new material into deliberations that was not already known by the jury from the trial itself. . . . The fact that only some of the jurors recalled the comments tends to indicate that this was not a discussion of any length or significance." (*Hord*, *supra*, 15 Cal.App.4th at pp. 727-728.) An initial declaration from one juror recited another juror's "oblique remark about a party not saying anything to protect himself." (*Id.* at p. 728.) "Although this comment may have carried a greater potential for prejudice than a mere statement of curiosity," it did not necessitate reversal because the discussion did not appear to be lengthy or suggest "a movement to disobey the court's instructions." (*Ibid.*) Most importantly, the jurors were reminded they could not consider the defendant's failure to testify. (*Id.* at pp. 727-728.)

*Leonard*, *supra*, 40 Cal.4th 1370 is also illustrative. In that capital case, the jury committed misconduct by discussing the defendant's failure to testify during its penalty phase deliberations. Specifically, the jurors said they wished the defendant had testified so they could have better understood why he committed the crimes. (*Id.* at pp. 1424-1425.) Our Supreme Court independently determined the misconduct was not prejudicial, reasoning that the jurors' comments "merely expressed regret that defendant had not testified, because such testimony might have assisted the jurors in understanding him better. . . . '[W]anting to hear defendants testify is natural. We do the best we can to deter jurors from speculating and from drawing negative inferences, but merely referencing that they wish he would have testified is not the same as punishing the [d]efendant for not

28

testifying. It is not the same as drawing negative inferences from the absence of testimony.'" (*Ibid.*)

Finally, in *Loker*, *supra*, 44 Cal.4th 691, juror misconduct again was not prejudicial. In their original declarations, several jurors stated they discussed, during penalty deliberations, the defendant's failure to testify as signifying lack of remorse. (*Id.* at p. 748.) Amended declarations clarified that, whenever the topic was brought up, the foreperson had reminded the jury they could not consider it and must restrict its deliberations to the evidence and the instructions. (*Ibid.*) The presumption of prejudice was rebutted "because the discussions were brief, the foreperson admonished the jury, and thereafter the subject was dropped." (*Id.* at p. 749.) The *Loker* court reasoned: "Clearly, the [trial] court accepted the version of the discussions presented in the amended declarations. We will not disturb that credibility determination, which is supported by substantial evidence. [Citation.] [¶] . . . It is natural for jurors to wonder about a defendant's absence from the witness stand. [Citation.] . . . *Even if some comments disclosed in the amended declarations might have given rise to inferences adverse to defendant*, the foreperson promptly forestalled that possibility, reminding the jurors that defendant had a right not to testify and that his assertion of that right could not be held against him." (*Ibid.*, italics added.)

Moore insists juror statements in this case are distinguishable from those made in *Hord*, *Leonard*, and *Loker* because instead of merely expressing regret or curiosity about Moore's decision not to testify, the jurors' statements "linked that [decision] to determining [Moore's] culpability for the crime." We disagree. Substantial evidence supports the trial court's implicit finding the misconduct in this case consisted of brief passing comments in which the jurors expressed their wish Moore had testified because it would have been helpful to have heard his side of the story.

Jurors Nos. 3 and 10 did, at least initially, testify to some more troubling comments. (*See People v. Hord*, *supra*, 15 Cal.App.4th at p. 728 ["if a juror were to say, 'The defendant didn't testify so he is guilty,' or 'we will have to find the defendant guilty of the greatest charges to ensure he will be adequately punished,' the comments go beyond mere curiosity and lean more toward a juror's drawing inappropriate inferences from areas which are off limits"].) Specifically, Juror No. 3 originally declared that Jurors Nos. 7, 9, and 10 "stated that [Moore's] failure to testify supported their belief and their verdict that he was guilty of murder." However, Juror No. 3's testimony at the evidentiary hearing was to the contrary. Juror No. 3 testified he did not remember anyone saying Moore's failure to testify supported their belief he was guilty.[17] Furthermore, Jurors Nos. 7, 9,

---

[17] [footnote twelve in original text] In construing the record in favor of the judgment, we could infer the trial court found Juror No. 3 entirely "not credible" due to inconsistencies in his declarations and sworn testimony. (*See Jie v. Liang Tai Knitwear Co.*, *supra*, 89 Cal.App.4th at pp. 666-667.) Even if the trial court found Juror No. 3 credible in part, the court properly ignored that part of Juror No. 3's testimony in which he stated he considered Moore's failure to testify in

and 10 all explicitly denied making such a statement. Nor did other jurors recall such statements having been made. Juror No. 3 ultimately retracted his testimony regarding the statements made by Jurors Nos. 7, 9, and 10, and Juror No. 3's hypotheses regarding other jurors' mental processes are clearly inadmissible (Evid. Code, § 1150).

In his initial declaration, Juror No. 10 also declared that, among other things, jurors stated Moore should have testified "to protect his innocence," "had [Moore] . . . testified regarding what occurred, it would have likely helped to lessen his degree of culpability," and that "jurors continually came back to the issue that [Moore] had not testified to fill in the holes and unexplained questions [regarding what happened on the night of the shooting.]" However, again, the other jurors were unanimous in not recalling any statements resembling the first two statements. Although the "fill in the holes" comments were corroborated, Juror No. 10's testimony at the evidentiary hearing clarified that such comments were made in the context of the jurors considering defense evidence and speculating about Moore's possible explanations for the shooting. Such comments certainly do not appear to suggest negative inferences were taken from Moore's decision not to testify.

In contrast to Jurors Nos. 3 and 10, Jurors Nos. 2, 5, 7, 8, and 9 presented a consistent account of the limited nature and extent of the jurors' discussion of Moore's failure to testify. On this record, we cannot question the trial court's implicit crediting of those jurors who only recalled passing statements that it would have been helpful to have Moore's side of the story. (See *People v. Nesler*, *supra*, 16 Cal.4th at p. 582; *In re Carpenter*, *supra*, 9 Cal.4th at p. 646.) Substantial evidence supports the trial court's finding.

Most importantly, even if the trial court found some juror statements suggested negative inferences, reversal is not mandated. (*People v. Lavender*, *supra*, 60 Cal.4th at p. 689 ["[t]he likelihood that comments drawing inappropriate inferences from a defendant's decision not to testify pose an increased 'chance of prejudice' . . . as compared to comments merely expressing curiosity about a defendant's decision does not mean that an explicit reminder to the jury that this is a forbidden topic would necessarily be ineffective at dispelling the presumption of prejudice"]; *Hord*, *supra*, 15 Cal.App.4th at p. 728; *Loker*, *supra*, 44 Cal.4th at p. 749.) Just as in *Hord* and *Loker*, substantial evidence supports the trial court's implied finding that, whenever the subject came up, jurors were admonished not to consider Moore's decision not to testify. The jurors were ultimately unanimous on this point. Juror No. 3 may have initially declared he did not hear "any juror actually stop further discussion regarding [Moore's] failure to testify," but he later conceded another juror reminded them they should not consider it.

reaching his verdict. This testimony was inadmissible as it merely demonstrated Juror No. 3's reasoning process. (See Evid. Code, § 1150; *People v. Nesler*, *supra*, 16 Cal.4th at p. 584 [juror's testimony that extraneous information played no role in her consideration of evidence is inadmissible].)

Moore again maintains the facts of this case are distinguishable because, whatever reminders may have been given in this case, discussion continued over a significant amount of time about Moore's failure to testify. "Where . . . a mistake by one or more jurors during deliberations is promptly followed by a reminder from a fellow juror to disregard a defendant's decision not to take the stand—and the discussion of the forbidden topic thereafter ceases, without any objective evidence that the reminder of the court's instructions was ineffective—the reminder tends strongly to rebut the presumption that '[t]he defendant's failure to testify may still have affected the decision of at least one of the jurors.'" (*People v. Lavender*, *supra*, 60 Cal.4th at p. 691, italics added.) In contrast, "a persistent refusal to follow the court's instructions would tend to confirm the prejudicial effect of the misconduct." (*Id.* at p. 692.)

Jurors Nos. 3 and 10 testified that Moore's decision not to testify was discussed for somewhere between 30 minutes up to four hours over the course of two days of deliberations. However, the trial court's implicit discrediting of these statements is supported by the record. Simply put, the testimony was conclusory; none of the jurors, including Nos. 3 and 10, testified about anything more than, at most, a few minutes of conversation. Juror No. 3 was the only juror to suggest the admonitions of other jurors were ineffective. And as we have previously stated, we are in no position to second guess the trial court's implicit discrediting of Juror No. 3, who appears to have based that conclusion on his own "second thoughts" about the verdict, rather than any overt act corroborated by the other jurors.

We see no meaningful basis on which to distinguish this case from *Hord*, *Leonard*, and *Loker*. Nor can we agree with Moore that the evidence supporting the jury's second degree murder verdict is weak. Timothy testified that Moore aimed a loaded rifle at Brown's chest and, after being warned to put the gun down, Moore pulled the trigger. Other evidence, including Moore's own admissions, corroborated Timothy's account and suggested Moore was conscious of his actions and their natural and probable consequences. Substantial evidence supports the trial court's findings and our independent review of the record shows no substantial likelihood of prejudice.

ECF No. 20-9 (Ex. C) at 21-27. Petitioner raised this claim in a petition for review to the

California Supreme Court (ECF No. 20-13 (Ex. G) at 17; the petition was summarily denied (ECF

No. 20-14 (Ex. H)).

## 2.  Relevant Federal Law

Under the Sixth Amendment, a criminal defendant has the right to be tried by an impartial

jury. *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Due process demands that a criminal

defendant be tried by "a jury capable and willing to decide the case solely on the evidence before

it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982).

The discussion of Federal Rule of Evidence 606(b), contained in the foregoing section, is also applicable here.

### 3. Analysis

Petitioner is not entitled to relief on this claim.

First, 606(b)(2) limits the scope of what this court can consider with respect to juror statements challenging the validity of a verdict. This court may only consider "extraneous prejudicial information . . . improperly brought to the jury's attention;" "outside influence . . . improperly brought to bear upon any juror;" or "a mistake . . . in entering the verdict onto the verdict form." Fed. R. Evid. 606(b)(2).[18] The Ninth Circuit has held that 606(b) bars consideration of juror statements indicating that they ignored a court's instructions and discussed a defendant's failure to testify during their deliberations. *See United States v. Rutherford*, 371 F.3d 634, 640 (9th Cir. 2004) ("[T]he jurors learned of Mrs. Rutherford's failure to testify through their personal observations during trial, not through a prohibited route or improper *ex parte* contact. Under these circumstances, the district court did not err in concluding that testimony regarding Mrs. Rutherford's absence from the witness stand is inadmissible under Rule 606(b) . . . ."); *see also Raley v. Ylst*, 470 F.3d 792, 803 (9th Cir. 2006) ("The fact that Petitioner did not testify in his own defense is not extrinsic evidence. Although the jury's discussion of this issue clearly violated the trial court's instructions, what happened (or did not happen) in the courtroom was a part of the trial, not extrinsic to it. We may not inquire into a jury's deliberations concerning the evidence at trial.") (internal citations omitted).

Second, even if Rule 606(b) posed no bar to this claim, the petition still must be denied. The state court's finding that there was no substantial likelihood of prejudice was not objectively unreasonable. *See Towery v. Schriro*, 641 F.3d 300, 304 (9th Cir. 2010) ("When a state court has found a constitutional error to be harmless beyond a reasonable doubt, a federal court may not grant habeas relief unless the state court's determination is objectively unreasonable."). As the state court of appeal noted, there were conflicting statements regarding the nature and extent of

_____

[18] This rule applies in federal habeas proceedings. *See Capps v. Sullivan*, 921 F.2d 260, 262 (10th Cir. 1990).

the jury's discussion about petitioner's failure to testify. ECF No. 20-9 at 27 ("In contrast to Jurors Nos. 3 and 10, Jurors Nos. 2, 5, 7, 8, and 9 presented a consistent account of the limited nature and extent of the jurors' discussion of Moore's failure to testify. On this record, we cannot question the trial court's implicit crediting of those jurors who only recalled passing statements that it would have been helpful to have Moore's side of the story."). This court is poorly positioned to second-guess the state courts' determinations of juror credibility. Indeed, the Ninth Circuit has explicitly noted that "[n]o sort of factual finding . . . is more appropriate for deferential treatment than is a state court's credibility determination." *Knaubert v. Goldsmith*, 791 F.2d 722, 727 (9th Cir. 1986); *see also Rushen v. Spain*, 464 U.S. 114, 120 (1983) ("Here, both the State's trial and appellate courts concluded that the jury's deliberations, as a whole, were not biased. This finding of 'fact' -- on a question the state courts were in a far better position than the federal courts to answer -- deserves a 'high measure of deference . . . .'").

### C. Involuntary Manslaughter Instruction

Finally, petitioner argues that the trial court's instruction on involuntary manslaughter relieved the prosecution of its burden to prove malice beyond a reasonable doubt in order to obtain a murder conviction. The instruction at issue – CALCRIM 626 – directed:

> Involuntary manslaughter has been proved if you find beyond a reasonable doubt that:
>
> 1. The defendant killed without legal justification or excuse;
>
> 2. The defendant did not act with the intent to kill;
>
> 3. The defendant did not act with a conscious disregard for human life;
>
> AND
>
> 4. As a result of voluntary intoxication, the defendant was not conscious of (his/her) actions or the nature of those actions.
>
> The People have the burden of proving beyond a reasonable doubt that the defendant was not unconscious. If the People have not met this burden, you must find the defendant not guilty of murder.

ECF No. 20-1 (Clerk's Transcript Vol. 1) at 288. Petitioner contends that the instruction is flawed in two ways. First, he argues that it required proof beyond a reasonable doubt of the

absence of malice. He contends that a correct instruction would include language indicating involuntary manslaughter is proved if the prosecution has failed to prove beyond a reasonable doubt the presence of malice. Thus, petitioner argues that the instruction, as phrased, incorrectly placed the burden on him to demonstrate his lack of malice. Second, petitioner argues that the instruction restricted his available defenses by requiring him to demonstrate not only the absence of malice, but also that he lacked consciousness at the time the rifle was fired. He contends that this instruction effectively limited his defense to lack of consciousness. In other words, "[t]he jury was precluded from returning a verdict of involuntary manslaughter based on the theory that, while [petitioner] was conscious at the time, the shooting was accidental rather than intentional, and thus non-malicious." ECF No. 1 at 48.

### 1. State Court Decision

Petitioner raised this claim on direct appeal, and the state court of appeal rejected it:

> Moore also contends his second degree murder conviction should be reversed because the jury was improperly instructed. Moore's position is that an instruction given on involuntary manslaughter, pursuant to CALCRIM No. 626, relieved the prosecution of its burden to prove malice beyond a reasonable doubt in order to obtain a conviction for murder. Moore did not object to this instruction at trial. In fact, apparently making a tactical decision that a conviction on the lesser offense would be preferable, he specifically requested that CALCRIM No. 626 be given without any modification. Although this raises a serious question regarding whether the instant claim was preserved for our review, we nonetheless proceed to the merits.[19]
>
> In order to provide context for Moore's legal arguments, we first review the law of homicide, and specifically the distinctions between first and second degree murder and involuntary manslaughter. "Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a); *People v. Rios* (2000) 23 Cal.4th 450, 460, 97 Cal. Rptr. 2d 512, 2 P.3d 1066.) Malice may be express or implied. (§ 188.) Express malice is shown by the defendant's intent to unlawfully kill. (*People v. Perez* (2010) 50 Cal.4th 222, 233, fn. 7, 112 Cal. Rptr. 3d 310, 234 P.3d 557.) "'Malice is implied . . . when a killing results from an intentional act, the natural consequences of which are dangerous to human life, and the act is deliberately performed with knowledge of the danger to, and with conscious

---

[19] [footnote fourteen in original text] The People do not raise invited error or forfeiture, and Moore asserts section 1259 permits us "[to] review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."

disregard for, human life.'" (*People v. Carlson* (2011) 200 Cal.App.4th 695, 703, 133 Cal. Rptr. 3d 218.) Thus, malice exists if the homicide was committed with an intent to kill or with a conscious disregard for danger to human life. (*Rios*, at p. 460.)

First degree murder is a killing that is premeditated and deliberate, that occurs during the commission of certain enumerated felonies (statutory felony murder), or that occurs under other specified circumstances not relevant here, where malice is not negated by heat of passion or imperfect self-defense. (§ 189; *People v. Rios*, *supra*, 23 Cal.4th at p. 465.) Second degree murder is any other killing committed with an intent to kill or conscious disregard for danger to human life "but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." (*People v. Knoller* (2007) 41 Cal.4th 139, 151, 59 Cal. Rptr. 3d 157, 158 P.3d 731; accord, § 189.)

Involuntary manslaughter is defined by statute as "the unlawful killing of a human being without malice . . . [¶] . . . [¶] . . . in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection," excepting acts committed in the driving of a vehicle. (§ 192, subd. (b).) "[T]here are three types of predicate acts that may underlie involuntary manslaughter: a misdemeanor, a lawful act, or a noninherently dangerous felony. All three acts require the same mens rea of criminal negligence." (*People v. Butler* (2010) 187 Cal.App.4th 998, 1012, 114 Cal. Rptr. 3d 696.) "The term 'unlawful act, not amounting to felony' as used in section 192(b) codifies the traditional common law form of involuntary manslaughter as the predicate for finding that a homicide committed without malice was involuntary manslaughter." (*People v. Cox* (2000) 23 Cal.4th 665, 671, 97 Cal. Rptr. 2d 647, 2 P.3d 1189.) This first clause, which is often referred to as the misdemeanor manslaughter rule, applies only if the underlying misdemeanor committed is dangerous to human life or safety, not in the abstract, but under the circumstances of its commission and is committed with criminal intent or criminal negligence. (*Id.* at p. 675.) Under this theory, "an accidental shooting that occurs while the defendant is brandishing a firearm in violation of section 417 could be involuntary manslaughter." (*People v. Thomas*, *supra*, 53 Cal.4th at p. 814.)

Under section 192 subdivision (b)'s second clause, "without due caution and circumspection" has been construed to require criminal negligence. (*People v. Penny* (1955) 44 Cal.2d 861, 879, 285 P.2d 926.) Other nonstatutory theories of involuntary manslaughter have also been recognized. A killing while one is unconscious of one's acts due to voluntary intoxication is also involuntary manslaughter. (*People v. Abilez* (2007) 41 Cal.4th 472, 516, 61 Cal. Rptr. 3d 526, 161 P.3d 58.) Although "'[u]nconsciousness is ordinarily a complete defense to a charge of criminal homicide . . . [i]f the state of unconsciousness results from intoxication voluntarily induced, . . . it is not a complete defense. ([Former] Pen. Code, § 22.)'" (*People v. Ochoa* (1998) 19 Cal.4th 353, 423, 79 Cal. Rptr. 2d 408, 966 P.2d 442; accord § 29.4.) "When a person renders himself or herself

35

unconscious through voluntary intoxication and kills in that state, the killing is attributed to his or her negligence in self-intoxicating to that point, and is treated as involuntary manslaughter." (*Ibid*.)

We review the trial court's jury instructions independently. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569, 76 Cal. Rptr. 2d 239, 957 P.2d 928.) "'In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys. The test is whether there is a reasonable likelihood that the jury understood the instruction in a manner that violated the defendant's rights.' [Citation.] We determine the correctness of the jury instructions from the entire charge of the court, not from considering only parts of an instruction or one particular instruction. [Citation.] The absence of an essential element from one instruction may be cured by another instruction or the instructions taken as a whole. [Citation.] Further, in examining the entire charge we assume that jurors are ""'intelligent persons and capable of understanding and correlating all jury instructions which are given.""'" (*People v. Smith* (2008) 168 Cal.App.4th 7, 13, 85 Cal. Rptr. 3d 180.) The entirety of the court's instructions contradict Moore's contention that the burden of proof was reversed or that the jury could convict him of involuntary manslaughter only on an unconsciousness theory, even if malice was not proven beyond a reasonable doubt.

Pursuant to CALCRIM No. 626, the trial court instructed the jury: "Voluntary intoxication may cause a person to be unconscious of his or her actions. A very intoxicated person may still be capable of physical movement but may not be aware of his or her actions or the nature of those actions. [¶] A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drink or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] When a person voluntarily causes his or her own intoxication to the point of unconsciousness, the person assumes the risk that while unconscious he or she will commit acts inherently dangerous to human life. If someone dies as a result of the actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter. [¶] Involuntary manslaughter has been proved if you find *beyond a reasonable doubt* that: [¶] 1. The defendant killed without legal justification or excuse; [¶] 2. *The defendant did not act with the intent to kill*; [¶] 3. T*he defendant did not act with a conscious disregard for human life*; [¶] AND [¶] 4. As a result of voluntary intoxication, the defendant was not conscious of his actions or the nature of those actions. [¶] *The People have the burden of proving beyond a reasonable doubt that the defendant was not unconscious. If the People have not met this burden, you must find the defendant not guilty of murder*." (Italics omitted & added.)

Moore contends the above instruction is "incorrect" because, under italicized paragraphs 2 and 3 above, CALCRIM No. 626 erroneously shifted the burden to the defense to prove the absence of an intent to kill and the absence of a conscious disregard for human life in order to secure a verdict of involuntary manslaughter *and preclude a verdict of second degree murder*. In other words, he complains the

instruction is erroneous because it does not state "involuntary manslaughter has been proved if the jury finds beyond a reasonable doubt that the defendant did kill without legal justification or excuse, *but further concludes that the prosecution has failed to prove beyond a reasonable doubt the presence of malice*—i.e., that the defendant acted with the intent to kill or acted with a subjective and conscious disregard for human life."

There is no reasonable likelihood the jury could have believed that, in order to be acquitted of second degree murder, Moore had the burden to prove the absence of malice beyond a reasonable doubt. Nothing in CALCRIM No. 626 places the burden of proof on Moore. The jury was given the standard reasonable doubt instruction (CALCRIM No. 220), by which it was informed: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] . . . [¶] . . . *Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal* and you must find him not guilty." Most importantly, the jury was instructed the People had the burden to prove all the elements of second degree murder. From these two instructions alone, we can assume the jury understood they must acquit Moore if they had a reasonable doubt whether the People proved malice.

The jury was also instructed, under CALCRIM No. 580, on misdemeanor manslaughter/lawful act theories of involuntary manslaughter. That instruction provides: "When a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter. [¶] The difference between other homicide offenses and involuntary manslaughter depends on whether the person was aware of the risk to life that his or her actions created and consciously disregarded that risk. An unlawful killing caused by a willful act done with full knowledge and awareness that the person is endangering the life of another, and done in conscious disregard of that risk, is voluntary manslaughter or murder. An unlawful killing resulting from a willful act committed without intent to kill and without conscious disregard of the risk to human life is involuntary manslaughter. [¶] . . . [¶] In order to prove murder, *the People have the burden of proving beyond a reasonable doubt that the defendant acted with intent to kill or with conscious disregard for human life. If the People have not met either of these burdens, you must find the defendant not guilty of murder.*" (Italics added.) Moore's trial counsel emphasized the italicized language in closing argument.

The trial court's entire charge to the jury made clear the People had the burden of proof on both murder and involuntary manslaughter. This burden was in no way altered by the fact that Moore's trial counsel urged the jury to reject second degree murder and convict

/////

/////

Moore of, at most, involuntary manslaughter.[20] (*See Carella v. California* (1989) 491 U.S. 263, 265, 109 S. Ct. 2419, 105 L. Ed. 2d 218 [prosecution bears burden of proving all elements of an offense beyond a reasonable doubt.].)

Moore also contends CALCRIM No. 626 improperly instructed the jury that a conviction for involuntary manslaughter, on any theory, required not only the absence of malice but also that Moore lacked consciousness at the time the rifle was fired. Thus, Moore insists the instruction "effectively limited [his] defenses to the single one of lack of consciousness. The jury was precluded from returning a verdict of involuntary manslaughter based on the theory that, while [Moore] was conscious at the time, the shooting was accidental rather than intentional, and thus non-malicious." Our previous recitation of CALCRIM No. 580 refutes Moore's contention. There is no conflict in the two instructions. CALCRIM Nos. 580 and 626 simply instruct on two distinct theories of involuntary manslaughter. (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1381, fn. 15, 80 Cal. Rptr. 3d 473.) There is no reasonable likelihood the jury would have concluded it could only convict Moore of involuntary manslaughter if he was unconscious at the time the rifle was fired.

The trial court did not err in instructing the jury with CALCRIM No. 626.[21]

ECF No. 20-9 (Ex. C) at 31-37. Petitioner raised this claim in a petition for review to the California Supreme Court (ECF No. 20-13 (Ex. G) at 30; the petition was summarily denied (ECF No. 20-14 (Ex. H)).

/////

/////

/////

---

[20] [footnote fifteen in original text] To the extent Moore suggests voluntary intoxication is a complete defense to second degree murder, he is incorrect. With respect to murder prosecutions, voluntary intoxication evidence is admissible as to whether the defendant premeditated, and deliberated, or harbored express malice aforethought. (*People v. Timms* (2007) 151 Cal.App.4th 1292, 1296-1297, 60 Cal. Rptr. 3d 677; § 29.4, subd. (b).) However, voluntary intoxication can no longer be used to negate implied malice in a second degree murder prosecution. (*People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1081, 124 Cal. Rptr. 3d 182; *People v. Timms, supra*, 151 Cal.App.4th at pp. 1298, 1300-1301; § 29.4, subds. (a), (b).)

[21] [footnote sixteen in original text] Accordingly, we need not address the ineffective assistance of counsel claim Moore asserts, for the first time, in his reply brief. It is also unnecessary to address the People's alternative argument that there is no substantial evidence Moore was unconscious and the trial court had no obligation to instruct the jury regarding this theory of involuntary manslaughter.

38

## 2. Relevant Federal Law

"It is not the province of a federal court to reexamine state court determinations of state law questions." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). With respect to jury instructions, the Supreme Court has held that:

> The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The question in such a collateral proceeding is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," not merely whether "the instruction is undesirable, erroneous, or even 'universally condemned.'"

*Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

## 3. Analysis

As an initial matter, any claim that the relevant instruction was erroneous under state law is foreclosed by the state court's determination that it was not. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). Thus, the only question is whether the instruction violated petitioner's federal due process rights. It did not.

The court of appeal reasonably concluded that the jury instructions, viewed in their totality, established that the prosecution had the burden of proof on murder and voluntary manslaughter. *See Boyde v. California*, 494 U.S. 370, 378 (1990) ("[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge."). As the state court noted, the jury was instructed as to reasonable doubt:

> A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.

ECF No. 20-1 (Clerk's Transcript Vol. 1) at 261. The jury was also instructed, pursuant to CALCRIM 580, that: that the prosecution had the burden, with respect to second degree murder,

of proving beyond a reasonable doubt that petitioner "acted with intent to kill or with conscious disregard for human life." *Id.* at 285 (CALCRIM 580).

And, with respect to the issue of consciousness, the court of appeal reasonably determined that the trial court's issuance of CALCRIM 580 precludes a finding that the jury was instructed that it could *only* convict petitioner if he was unconscious at the time the rifle fired. CALCRIM 580 provides:

> When a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter.
>
> The difference between other homicide offenses and involuntary manslaughter depends on whether the person was aware of the risk to life that his or her actions created and consciously disregarded that risk. An unlawful killing caused by a willful act done with full knowledge and awareness that the person is endangering the life of another, and done in conscious disregard of that risk, is voluntary manslaughter or murder. An unlawful killing resulting from a willful act committed without intent to kill and without conscious disregard of the risk to human life is involuntary manslaughter.
>
> The defendant committed involuntary manslaughter if:
>
> The defendant committed a crime that possessed a high risk of death or great bodily injury because of the way in which it was committed; and
>
> The defendant's acts unlawfully caused the death of another person.
>
> Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.
>
> In order to prove murder or voluntary manslaughter, the People have the burden of proving beyond a reasonable doubt that the defendant acted with intent to kill or with conscious disregard for human life. If the People have not met either of these burdens, you must find the defendant not guilty of murder and not guilty of voluntary manslaughter.

*Id.* at 284. Separately, the trial court instructed with respect to CALCRIM 626:

> Voluntary intoxication may cause a person to be unconscious of his or her actions. A very intoxicated person may still be capable of physical movement but may not be aware of his or her actions or the nature of those actions. A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drink, drug, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.

/////

40

When a person voluntarily causes his or her own intoxication to the point of unconsciousness, the person assumes the risk that while unconscious he or she will commit acts inherently dangerous to human life. If someone dies as a result of the actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter.

Involuntary manslaughter has been proved if you find beyond a reasonable doubt that:

The defendant killed without legal justification or excuse. That's No. 1.

No. 2. The defendant did not act with the intent to kill;

No. 3. The defendant did not act with a conscious disregard for human life; and

4. As a result of voluntary intoxication, the defendant was not conscious of his actions or the nature of those actions.

The People have the burden of proving beyond a reasonable doubt that the defendant was not unconscious. If the People have not met this burden, you must find the defendant not guilty of murder or voluntary manslaughter.

ECF No. 20-7 (Reporter's Transcript Vol. 3) at 210-211. A review of the foregoing instructions supports the court of appeal's determination that the each provides for distinct theories of involuntary manslaughter. The instructions are separate, distinct, and non-conflicting. Thus, the jury was not required to find that petitioner lacked consciousness at the time the rifle was fired in order to return a verdict of involuntary manslaughter.

In light of the foregoing, the court concludes that, at the very least, reasonable jurists could disagree as to the court of appeal's jury instruction determinations vis à vis malice and consciousness. Thus, habeas relief is foreclosed. *See Harrington v. Richter*, 562 U.S. 86, 101 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. . .").

CONCLUSION

For all the reasons explained above, the state courts' denial of petitioner's claims was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d). Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

/////

41

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. *See* Rule 11, Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: December 4, 2019.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE